**SOUTHERN TRANSP. CO. et al. v. ADAMS et al.**

**No. 3680.**

Court of Civil Appeals of Texas. Beaumont.

June 13, 1940.

Rehearing Denied June 26, 1940.

Strasburger, Price, Holland, Kelton & Miller, Taylor, Irwin & Irwin, and Touchstone, Wight, Gormley & Touchstone, all of Dallas, for appellants.

Chaney, DeShazo & Hyde, of Dallas, for appellees.

WALKER, Chief Justice.

On August 30, 1937, about 10:30 p. m., while attempting to cross Stonewall Street, in the city of Dallas, Noah Carl Adams was struck and knocked down in the street by an automobile driven by appellant, John Wesley Henry. A few moments thereafter, Adams was run over and killed by a truck owned and operated by appellant, Southern Transportation Company. This suit was brought by appellee, Mrs. Artie Adams, surviving widow of Noah Carl Adams, for herself and as next friend of her four minor children, born to her and her deceased husband, against the two appellants, praying for damages against them, jointly and severally, in the sum of $60,000 for the death of her husband.

Answering special issues, the jury found, on the negligence plead by appellees against Southern Transportation Company, that the driver of its truck was guilty of negligence, proximately causing Adams' death, in driving the truck at a rate of speed in excess of 18 miles per hour, and in failing to keep a proper lookout for pedestrians; on the negligence plead against John Wesley Henry, that he was guilty of negligence, proximately causing the death of Adams, in driving his automobile at a rate of speed in excess of 20 miles per hour, and in failing to keep a proper lookout, and in failing to use ordinary care "with respect to the rate of speed at which he was driving." Adams was acquitted of all acts of contributory negligence plead against him by appellants, and submitted to the jury. The jury found that the failure of Henry to keep a proper lookout was not the sole proximate cause of Adams' death, and it found in favor of Southern Transportation Company on the issue of discovered peril. It was also found that Adams' death was not the result of an unavoidable accident. As the issue

related to the acts of the truck driver, the jury found that the "impact" of the automobile was "a new and independent cause" and, as that issue related to Henry, that the "impact" of the truck was a new and independent cause. The jury assessed appellees' damages at the sum of $14,000, for which judgment was entered in their favor on the jury's verdict against the two appellants, jointly and severally, from which they prosecuted their appeal to the Dallas Court of Civil Appeals. The case is on our docket by order of transfer by the Supreme Court.

At the time he was struck by appellant Henry, Adams, walking from west to east, was crossing Stonewall street at its intersection with a paved driveway commonly used by pedestrians. Henry's automobile knocked Adams to the pavement, in the path of the street traffic. Before Adams got up and out of the way of the traffic, he was struck by the truck of Southern Transportation Company, driven in an opposite direction from Henry's automobile, and run over and killed. It had been raining that evening. The street was paved with asphalt. There were two streetcar lines in the street. The truck of Southern Transportation Company was being driven on its side of the street, in a southerly direction. The driver of the truck, when within a few feet of Adams as he lay on the pavement, knocked there by the Henry automobile, attempted to swerve to the left. The Henry automobile was being driven in a northerly direction.

■ We overrule the contention of Southern Transportation Company that it was "a matter of pure speculation, surmise and guess as to whether or not the said Adams would not have died from the results of his impact with the automobile and with the asphalt street which had already taken place before he was struck by the truck in question." On this issue, appellees' witness King testified:

"Q. Did the automobile strike him? A. The left front fender did.

"Q. What happened to the man after he was struck? A. He stumbled backwards a few feet and fell as though his heel or foot struck something and tripped him down on the pavement.

"Q. When you saw him fall what did you do? A. I ran out there to assist him to see whether he was hurt.

"Q. When you got out there was the man up yet? A. He was in a sitting position after I got there.

"Q. Did you look at his face? A. Yes, I saw his face.

"Q. Was there any blood? A. No, sir, no blood.

"Q. Did you assist him in any way? A. No, sir.

"Q. Why? A. Because I heard some tires singing on the street and I looked up and I noticed it was a truck coming.

"Q. What else did you notice beside the truck coming? A. I just noticed, I noticed John Henry's car was parked over there and he was trying to stop the truck.

"Q. What did you do with reference to stopping the truck? A. I walked about 10 feet and whistled and hollered and flagged at this man with my hat. * * *

"Q. When you saw the truck coming what did you do? A. I went around this man and flagged the truck. He had raised in a sitting position as I went around.

"Q. You went on all the way around him? A. I walked on up to his side, not on the side the truck was coming, but the far side, he raised up in a sitting position.

"Q. I thought you said before you got to him you saw the truck coming? A. That is after he raised up in a sitting position.

"Q. Did you see the truck coming before you got to the man? A. No, sir.

"Q. You got to the man before you saw the truck? A. That's right.

"Q. Then was he pale, his face pale or how? A. No, sir, it didn't look pale to me.

"Q. You know it was not? A. Yes.

"Q. You could see good enough to see that his face was not pale? A. Yes.

"Q. You could have told what color his eyes were if you wanted to? A. I might have.

"Q. It was light enough for that? A. It was plenty light to see the color of his eyes, yes, sir.

"Q. He didn't have his face wrinkled up with a frown? A. He didn't show any sign of pain."

Appellant Henry testified that he saw an object in front of his car which appeared to him to be a person; he applied his brakes and tried to avoid hitting the man; after striking the man he brought his car to a,

stop and went back; it was a dark night; Adams was either running or stumbling and was not walking; the left rear fender of his car was dented.

"Q. When you got out and looked around, what did you see? A. I saw the form of a human laying on the 'pavement there.

"Q. What then happened? A. I looked ahead of me, as I started to get out of the car, and saw another automobile coming down the street.

"Q. Then what happened? A. I looked back and saw the man trying to get up. I attempted to open the door but the car was approaching and I didn't have time to get out of my car. I tried to stop the man that was coming, in other words, I attempted to get out and have my left foot on the ground and my window was down, the glass was down on this left door and I had this arm out trying to wave this car down, but seemingly I was not able to do it. Of course, after the car passed I completed my attempt to get out and flag it on down.

"Q. Is that when the man was struck? A. Yes.

"Q. By the truck? A. Yes, sir.

"Q. It happened just as fast as it could? A. Yes, sir. * * *

"Q. How far did you knock him? A. I didn't knock him in his face that I know of.

"Q. How far away was he from the point where he was when you and he came together? A. When I looked back the second time before the truck got there he was between the west rails.

"Q. How far was he from the point where you and he came together? A. I imagine his feet were about two feet farther towards the west.

"Q. How far away was his head? A. His head was out north of his feet, the length of his body, I imagine four or five feet."

The driver of the truck testified:

"Q. On this night what was the condition of the weather out there? A. It was drizzling, just shortly before we left the warehouse.

"Q. What was the condition of the pavement on Stonewall when you got there? A. The water was standing along the curbs and the pavement was wet in spots and some spots were dry.

"Q. Do you recall the accident that occurred close to the intersection there? A. Yes, I do.

"Q. Will you please turn to the Jury and explain to them the occasion, your action and what you did from the time you entered Stonewall from Gurley Street up to Haskell, that is the block on Stonewall between Gurley and Haskell? A. As I was turning into Stonewall Street, I went that distance, a little better than a block when another car coming from the other direction turned in on Stonewall Street, and as I got past this car on Stonewall Street I was going slowly and there was an object loomed up on the paving directly in front of the radiator cap, and I swerved sharply to the left and applied the brakes at the same time and this later turned out to be a person, and by the time I swerved to the left in order to miss the object lying on the pavement and pulled over to the left side of the street I stopped.

"Q. Before you saw this object that you turned to the left on account of, did you pass any other vehicle? A. I had met a car.

"Q. Did the car have lights on? A. Yes.

"Q. Did you have your lights on? A. I did.

"Q. That car meeting you, did its lights shine in your face? A. Yes.

"Q. Before you passed this car that you met, did you see anything in the street at all? A. No, sir.

"Q. When was it that you saw this object in the street, Ralph? A. I saw the object in the street when I got around six or eight feet from it.

"Q. Was that right after you had passed the car you were meeting? A. Yes.

"Q. Were you looking ahead trying to see past as best you could? A. Yes.

"Q. What is the effect on your sight when you are meeting another car at night coming from the opposite direction? A. When the lights are bright, as in this instance, you can't see to distinguish any objects plainly except immediately in front of you when you have low rays of your lights shining.

"Q. Right after passing this automobile that was coming from the opposite direction you saw this object on the street, did you say? A. Yes, sir.

"Q. Can you tell what it was, or could you at that time? A. No, sir, at the time I couldn't tell what it was.

"Q. About how far was it from you at the time? A. I judge it would have been six or eight feet in front of me, it might have been more or less.

"Q. You say it might have been more or less? A. A few feet difference but not much difference.

"Q. When you did see that what did you do? A. When I did see that I immediately applied the brakes and started turning to the left.

"Q. Why did you turn to the left and apply the brakes? A. Because this object was immediately to the right of my radiator cap and in front of the right wheel.

"Q. Was you on your side of the road? A. Yes.

"Q. Did you know of anything else to do except to cut to the left and put on your brakes? A. That's all I could have done in order to have gone so far as to get clearance and keep from coming in contact with him.

"Q. Did you put on your brakes as hard as you could? A. I applied the tractor brakes as hard as I could.

"Q. Did you turn as far to the left as you had time to? A. Yes, sir.

"Q. So far as you knew, did you know that you struck the object until afterwards? A. I didn't know whether I had struck the object at all.

"Q. After you passed the object did you stop your truck? A. Yes, after I had passed the object I stopped.

"Q. Where? A. On the lefthand side of the street."

Dr. Sam Webb testified that, when a pedestrian is struck or brushed by an automobile and falls back, or flat on his back on the pavement, he could receive a serious injury, a concussion; he could not tell the extent of the injury without examining the injured person; the accident might or might not seriously injure the person; where the injured person could not raise himself any further up than a sitting position, he would think something was wrong with him.

On the evidence, it was the prerogative of the jury to determine the extent of the injuries inflicted upon Adams by the Henry automobile, and as a separate issue, by the truck.

■ Adams was not guilty of contributory negligence, as a matter of law, in attempting to walk across the street at the place of the accident, on the theory that he was crossing the street at a place not authorized by law. The following statement from appellees' brief raised the issue in Adams' favor that he was exercising ordinary care in attempting to cross the street at that particular place: "The witness, Cade, called by the plaintiff, testified that he had lived in the filling station for a period of thirteen months just preceding the accident in question, and that there was a paved walk running from Stonewall Street to South Carroll Street; that pedestrians commonly used the driveway back of his station to cross the street at its intersection and the paved walk from Stonewall to South Carroll. Mrs. J. D. Cade, a witness called by the plaintiffs, testified to the paved driveway in the rear of their filling station from South Haskell to Stonewall and the paved walk from Stonewall to South Carroll and that pedestrians used them. The witness, Herbert King, testified that more people used that passway and paved driveway in crossing Stonewall than use the intersection where South Haskell Street and Stonewall fork, because where the streets both fork is dangerous."

■ The court did not err in refusing to instruct a verdict for Southern Transportation Company on the theory that the evidence did not raise against it the issue that the negligence of its driver was a proximate cause of Adams' death. We think, under the evidence quoted above, that the jury could have found that the accident would not have happened but for the negligence of the driver in his rate of speed, and his negligence in failing to keep a proper lookout.

■ Though the jury convicted each of the appellants of acts of negligence, each constituting a proximate cause of the death of Adams, affirmative answers were returned to the following issues:

"Special Issue No. 47. Do you find from a preponderance of the evidence that the impact of the Terraplane Sedan and Noah Carl Adams was a new and independent cause of the death of Noah Carl Adams as far as Ralph E. Miller was concerned?

"Special Issue No. 47A. Do you find from a preponderance of the evidence that the impact of the truck of the Southern Transportation Company and Noah Carl

Adams was a new and independent cause of the death of Noah Carl Adams, as far as John Wesley Henry was concerned?"

On motion of appellees, judgment was entered in their favor, notwithstanding the jury's answers to special issues 47 and 47A. Both of these issues were raised by the evidence. The jury could have found that the negligence of the truck driver, in his rate of speed and in failing to keep a proper lookout, was broken by Henry's negligence, and that Henry's negligence was an intervening agency breaking the causal connection between the negligence of the truck driver and Adams' death. The evidence also raised the issue that the negligence of the truck driver broke the causal connection between Henry's negligence and the death of Adams. So, there is a clear conflict between the findings of the jury on the issues of proximate cause, as against both appellants, and the findings on the issues of new and independent cause.

■ The evidence, as given above, raised the issue of "unavoidable accident", which was submitted to the jury by the following question: "Do you find from a preponderance of the evidence that the death of Noah Carl Adams was not the result of an unavoidable accident?", on the following definition: "By the term 'Unavoidable accident' is meant the occurrence of an event without negligence on the part of any of the parties involved." We sustain the exception of Southern Transportation Company that the court should have instructed the jury that the death of Adams was the result of unavoidable accident, as between it and Adams, if it was occasioned without negligence on Adams' part and on the part of Southern Transportation Company. Southern Transportation Company was entitled to have the jury answer that the accident was unavoidable, if it found from the evidence that Adams was not guilty of any negligence, and that the truck driver was not guilty of any negligence. Negligence on the part of Henry would not prevent the accident from being "unavoidable" as between Adams and Southern Transportation Company, provided, as between Adams and Southern Transportation Company—just as between them—Adams' death was the result of an unavoidable accident. Dallas Ry. & Ter. Co. v. Price, 131 Tex. 319, 114 S.W.2d 859.

The jury was instructed to answer the issue of unavoidable accident: "Let your answer be: 'It was not the result of an unavoidable accident,' or 'It was the result of an unavoidable accident.'" On another trial, we suggest that this charge be made to conform with the suggestions of the Commission of Appeals in Gulf, C. & S. F. Ry. Co. v. Giun, 131 Tex. 548, 116 S.W. 2d 693, 116 A.L.R. 795.

■ Appellees had the right to introduce pictures of the accident and of the body of the deceased as it lay on the street, in so far as these pictures were pertinent to any issue before the jury. But, as the record appears on this appeal, appellees could have had the benefit of these pictures on this particular point without introducing that part of the picture emphasizing the horrors of the accident—the blood on the pavement, and other incidents in connection therewith, calculated to arouse the sympathies of the jury in favor of appellees, and their prejudices against appellants. 22 C.J. 914; Lynch v. Baldwin, Mo.Sup., 117 S.W. 2d 273.

■ We do not think question No. 4 gave undue emphasis and prominence to the issue "of keeping a lookout for pedestrians": "Do you find from a preponderance of the evidence that at the time and on the occasion in question Ralph E. Miller failed to keep a proper lookout for pedestrians?"

■ Officer Nelson was qualified to testify as to the rate of speed of the truck from his examination of the skid marks.

Because of the conflict in the jury's answers resulting from its findings on the issue of "a new and independent cause," and because of the error in the court's definition of "unavoidable accident," the judgment of the lower court is reversed and the cause remanded for a new trial.

Reversed and remanded.